UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

_____

ENVIRONMENTAL LAW & POLICY
CENTER                                     Case No. _____
35 East Wacker Drive, Suite 1600
Chicago, IL 60601

ADVOCATES FOR A CLEAN LAKE ERIE     Judge _____

            Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C. 20460

ANDREW WHEELER, in his official
capacity as Administrator of the United States
Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C. 20460

CATHY STEPP, in her official capacity as
Acting Regional Administrator of United
States Environmental Protection Agency,
Region 5,

77 West Jackson Boulevard
Mail Code: R-19J
Chicago, Illinois 60604-3507

                             Defendants.                 /

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

---

## COMPLAINT

---

Plaintiffs Environmental Law & Policy Center ("ELPC") and Advocates for a Clean Lake Erie

("ACLE") bring this action on behalf of themselves and their members, and allege as follows:

### NATURE OF THE ACTION

1.      Defendant the United States Environmental Protection Agency ("U.S. EPA") has

expressly endorsed an attempt by the Ohio Environmental Protection Agency ("Ohio EPA") to

evade its legal duty to address nutrient pollution that causes regular outbreaks of harmful algae in

western Lake Erie.

2.      For years, Ohio EPA failed to formally recognize the full impacts of harmful algal

blooms ("HABs") in western Lake Erie under the Clean Water Act ("CWA").

3.      Ohio EPA finally designated western Lake Erie in full as having "impaired" water

quality under the CWA in May 2018.

4.      This impairment designation was a direct result of a prior lawsuit brought by

Plaintiffs, and this Court's subsequent Opinion and Order requiring the U.S. EPA to address the

State's "substantial noncompliance" with the CWA. *ELPC et al. v. U.S. EPA et al.*, Case No.

17-cv-1514, Order at 5 (N.D. Ohio Apr. 11, 2018).

5.      Ohio EPA has since continued to evade implementing its obligation under Section

303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), to remedy the impaired water quality by

adopting an effective "Total Maximum Daily Load" ("TMDL") for agricultural runoff pollution,

especially phosphorus discharges, that eventually flow into western Lake Erie.

1

6.      A TMDL for western Lake Erie would establish a "cap" on phosphorus discharges to western Lake Erie that would then be implemented through more targeted pollution loading allocations and specific CWA permit provisions.

7.      This Court has described a TMDL as "a bedrock obligation under the CWA." *ELPC et al. v. U.S. EPA et al.*, Case No. 17-cv-1514, Order at 6 (N.D. Ohio Oct. 3, 2018). "[D]eveloping a TMDL is not optional," and a state may not "follow for as long as it wants some ultimately unproductive alternative." *Id.* at 21.

8.      Despite its Clean Water Act obligations, Ohio EPA has stated that it will delay compliance with the Act's directive to establish a TMDL for western Lake Erie.

9.      Instead, Ohio EPA asserts that it will pursue an alternative approach *without* any timeline or accountability mechanisms to determine whether that alternative will produce any results.

10.     Ohio EPA plainly laid out this position in its June 2018 Clean Water Act Integrated Report and impaired waters list that was then affirmatively approved by U.S. EPA.

11.     In that 2018 Integrated Report, Ohio EPA designated western Lake Erie as "a low priority" for a TMDL.  Ohio EPA, Ohio 2018 Integrated Water Quality Monitoring and Assessment Report ("2018 Integrated Report") at J-3 (June 2018).

12.     Ohio EPA provided this priority ranking as required by CWA section 303(d)(1)(A) for all impaired waters.  33 U.S.C. § 1313(d)(1)(A).  A state must establish TMDLs for water-quality-impaired waters "in accordance with the priority ranking" it assigns to the impaired water.  33 U.S.C. § 1313(d)(1)(C).  The priority ranking "among impaired waters directly aids the State by specifying the next water body for which it *must* develop a TMDL." *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 233 (D.D.C. 2011) (emphasis

2

added).

13.     Ohio EPA asserted that it would place a low priority on a western Lake Erie TMDL because it hoped to pursue an alternative approach primarily based on an unenforceable and non-binding State "Domestic Action Plan" under Annex 4 of the Great Lakes Water Quality Agreement ("GLWQA").  *Id.* at J-3, J-10.  The GLWQA provides none of the avenues for formal stakeholder input, public accountability, and judicial review provided under the Clean Water Act.

14.     At the same time, Ohio EPA stated that it would not list western Lake Erie as "Category 5-alternative" on its impaired waters list, as a water for which the State is pursuing "alternative restoration approaches" rather than a TMDL.  *Id.* at D-35.

15.      Ohio EPA explained that to list a water as Category 5-alternative, he State "must first develop an alternative plan and that plan must be reviewed and accepted by U.S.EPA."  *Id.* at J-2, D-35.  Ohio EPA admitted that it nevertheless had "not yet developed a formal . . . proposal to submit to U.S. EPA."

16.     Ohio EPA's "low" priority ranking for a western Lake Erie TMDL was also inconsistent with its own statements in a May 2018 document submitted to this Court to resolve Plaintiffs' prior lawsuit regarding U.S. EPA's failure to hold Ohio EPA to its Clean Water Act responsibilities.  Ohio EPA, 2016 Integrated Water Quality Monitoring and Assessment Report – Amendment ("2016 Integrated Report Amendment") (May 2018), *available at* https://www.epa.ohio.gov/Portals/35/tmdl/2016intreport/2016OH_IR_Amendment_May2018.pdf.

17.     In that May 2018 document, Ohio EPA had asserted that the western basin would be "one of the highest, if not the highest, priority for Ohio to address."  2016 Integrated Report

3

Amendment at 9.

18.     U.S. EPA approved the 2016 Integrated Report Amendment on May 10, 2018.

19.     U.S. EPA approved Ohio EPA's 2018 Integrated Report on July 9, 2018.  Letter from Linda Holst, Acting Div. Dir., Water Div., U.S. EPA Region 5, to Tiffani A. Kavalec, Chief, Div. of Surface Water, Ohio EPA (July 9, 2018) ("2018 Integrated Report Approval") (attached as Exhibit A).

20.     U.S. EPA's 2018 Integrated Report Approval accepted Ohio EPA's priority ranking for western Lake Erie as satisfying the State's obligations under the Clean Water Act.

21.     The 2018 Integrated Report Approval also affirmatively approved Ohio EPA's impaired waters list designating western Lake Erie as a "Category 5" impaired water rather than "Category 5-alternative."

22.     As a practical matter, these U.S. EPA approvals of Ohio EPA's listing category and priority ranking for western Lake Erie allow Ohio EPA to indefinitely rely on an ineffective and inadequate alternative as a basis for changing western Lake Erie to a "low" priority for a TMDL.

23.     The change to a "low" priority reduces any oversight by or accountability to U.S. EPA for Ohio EPA's timeline for preparing a TMDL and the effectiveness of its purported "alternative" plan.

24.     As a result, Ohio EPA will be able to continue dragging its feet and failing to protect western Lake Erie waters for many years more with limited legal and public accountability, while people in Ohio and the entire region suffer significant harm from recurring outbreaks of harmful algal blooms.

25.     Plaintiffs therefore seek judicial intervention to invalidate U.S. EPA's approval of

Ohio EPA's decision to change its priority ranking for western Lake Erie with – admittedly – no credible basis, as a way to avoid the State's legal responsibility under the CWA to establish a TMDL remedy for western Lake Erie.

26.     U.S. EPA's approval was legally invalid.

27.     Although Ohio has made a voluntary commitment under its Domestic Action Plan to address harmful algal blooms in western Lake Erie, with nutrient reduction targets set for both 2020 and 2025, the GLWQA includes no framework for holding the State accountable to that commitment.

28.     On information and belief, Ohio is not even close to meeting its interim 2020 nutrient reduction benchmark.

29.     U.S. EPA's approval of a low priority ranking for a western Lake Erie TMDL without a plan for any next steps removes will allow Ohio to continue on its failing trajectory even to 2025 and beyond.

30.     U.S. EPA's July 9, 2018 decision to approve Ohio EPA's categorization of western Lake Erie as Category 5 rather than Category 5-alternative was therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with" Section 303(d) of the Clean Water Act and 40 C.F.R. § 130.7, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

31.     U.S. EPA's July 9, 2018 decision to accept Ohio EPA's assignment of a low priority ranking to western Lake Erie was also "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with" Section 303(d) of the Clean Water Act and 40 C.F.R. § 130.7 in violation of the APA, 5 U.S.C. § 706(2)(A).

32.     Alternatively, to the extent U.S. EPA's July 9, 2018 approval letter was not a

"final agency action" reviewable under the APA pursuant to 5 U.S.C. § 704, U.S. EPA has failed to carry out a non-discretionary duty under the Clean Water Act and is subject to suit under 33 U.S.C. § 1365(a)(2).

33.     If a state decides not to develop a TMDL for an impaired water body, that refusal operates as a "constructive submission" of no TMDL and triggers U.S. EPA's obligation to approve or disapprove that submission within 30 days under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2).  *See, e.g.*, *Scott v. City of Hammond*, 741 F.2d 992 (7th Cir. 1984); *Columbia Riverkeeper v. Pruitt*, 337 F. Supp. 3d 989 (W.D. Wash. 2018).

34.      In this case, Ohio EPA's invalid reliance on an alternative approach in order to indefinitely defer its obligation to establish a TMDL for western Lake Erie, despite its contemporaneous admission that it had not yet developed an alternative plan for review by U.S. EPA, represents an affirmative decision not to establish a TMDL.

35.     That "constructive submission" of no TMDL is evidenced by the 2018 Integrated Report and impaired waters list, which will be in effect through at least mid-2020 – delaying even the start of the TMDL process until two years after Ohio EPA first listed all of western Lake Erie as impaired, and a full six years after it first list segments of western Lake Erie impaired.

36.     Ohio EPA's constructive submission therefore triggered U.S. EPA's obligation to disapprove such a submission within 30 days pursuant to section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2), and 40 C.F.R. § 130.7(d)(2).

37.     U.S. EPA has not carried out that duty.

38.     In fact, U.S. EPA actively endorsed Ohio EPA's course of action regarding a TMDL for western Lake Erie in the 2018 Integrated Report Approval.

39.     Plaintiffs therefore seek declaratory and injunctive relief directing U.S. EPA to require that Ohio EPA comply with the Clean Water Act by adopting a legally sufficient and adequate TMDL for western Lake Erie.

## JURISDICTION AND VENUE

40.     On July 9, 2018, U.S. EPA approved Ohio EPA's submission of its impaired waters list and priority rankings as part of the 2018 Integrated Report.

41.     U.S. EPA's approval of the 2018 Integrated Report, including specific approval of the designation of the western Lake Erie "assessment units" ("LEAUs") as Category 5 and their "low" priority ranking for a TMDL, was a final agency action subject to judicial review pursuant to 5 U.S.C. § 704. This approval: (1) was the consummation of U.S. EPA's decision-making process regarding Ohio EPA's classification of the western Lake Erie LEAUs as Category 5 impaired waters and Ohio EPA's priority ranking for those waters under 40 C.F.R. § 130.7; and (2) determined rights and obligations of the parties or caused legal consequences.

42.     Plaintiffs bring this petition for judicial review of U.S. EPA's approval of Ohio's impaired waters list pursuant to 5 U.S.C. §§ 701 *et seq.*  U.S. EPA's action was unlawful and should be set aside because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" under 5 U.S.C. § 706(2)(A).

43.     Alternatively, Ohio EPA's decision in the 2018 Integrated Report to indefinitely defer a TMDL for western Lake Erie without an alternative plan having been reviewed by U.S. EPA qualifies as a "constructive submission" of no TMDL, and triggered U.S. EPA's obligation to review or approve the State's failure to establish a TMDL within thirty days of July 9, 2018 under 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.7(d)(2).  Because U.S. EPA failed to carry out that non-discretionary duty by the statutory deadline, this court has jurisdiction under 33 U.S.C.

7

§ 1365(a)(2) to order U.S. EPA to conduct the required review.

44.     This court also has jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under laws of the United States.

45.     U.S. EPA's decision to allow Ohio EPA to pursue an unvetted and non-binding alternative in lieu of establishing a TMDL to address harmful algal blooms in western Lake Erie creates a continuing controversy that is actual and substantial.

46.     A substantial part of the events or omissions giving rise to the claim occurred on or near Lake Erie, which is located in the Northern District of Ohio, Eastern Division, making venue proper under 28 U.S.C. § 1391(e). Alternatively, venue is proper in this Northern District of Ohio because Plaintiffs' members are residents of this district.

## PARTIES

47.     Plaintiff ELPC is a Midwest-based not-for-profit public interest environmental legal and economic development advocacy organization focused on improving environmental quality, including clean water and healthy clean air, and protecting the Midwest's natural resources, including the Great Lakes.  ELPC's headquarters is in Chicago and ELPC has additional staff and offices in Illinois, Indiana, Iowa, Michigan, Minnesota, Ohio, Wisconsin and Washington, D.C.  ELPC members live, work, and play in and near Lake Erie and other Great Lakes. They use clean water from Lake Erie as a source of drinking water, and they use and enjoy Lake Erie for aesthetic and recreational values.

48.     Plaintiff ACLE is an environmental grassroots organization founded in Toledo, Ohio to protect the Western Lake Erie Basin and the communities that depend on it after a toxic algae bloom poisoned the drinking water for Toledo's more than 400,000 residents in August 2014. Part of ACLE's mission is to pressure government officials to establish an enforceable

8

plan for reducing phosphorus pollution in western Lake Erie, aimed at greatly reducing the harmful runoff that fuels toxic blooms of microcystin-producing cyanobacteria. ACLE's ultimate goal is to keep Lake Erie drinkable, fishable, and swimmable. ACLE is run by its members, who live and recreate near Lake Erie and depend on clean water from Lake Erie as a source of drinking water and aesthetic enjoyment, as well as a recreational resource.

49. Defendant Andrew Wheeler is currently the Acting Administrator of U.S. EPA and is being sued in his official capacity. The U.S. EPA Administrator is responsible for overseeing the agency, which in part includes overseeing its implementation of the CWA. This level of oversight extends to U.S. EPA's decisions to approve or disapprove a State's impaired waters list, priority rankings, and TMDLs submitted under CWA section 303, 33 U.S.C. § 1313.

50. Defendant Cathy Stepp is the Regional Administrator of U.S. EPA Region 5 and is being sued in her official capacity. She is responsible for overseeing Region 5 of the agency, which in part includes overseeing the Region's implementation of the CWA. The State of Ohio falls within the jurisdiction of Region 5. Ms. Stepp's level of oversight extends to decisions to approve or disapprove a State's impaired waters list, priority rankings, and TMDLs submitted under CWA section 303, 33 U.S.C. § 1313.

**STANDING**

51. Plaintiffs file this action on behalf of ELPC, ACLE, and their members.

52. ELPC's and ACLE's members regularly use western Lake Erie under Ohio's jurisdiction for recreation, aesthetic enjoyment, observation, and water supplies, and will continue to do so in the future. These uses are directly impaired by algae blooms and other phosphorus-related pollution. Such pollution harms water quality, reduces and damages fish populations, impedes the ability of boats to use the water, degrades aesthetic beauty, and

threatens the safety of drinking water supplies.

53.    ELPC and ACLE members own real and/or personal property in and around western Lake Erie under Ohio's jurisdiction that is adversely affected by algae blooms and other phosphorus-related pollution. Such adverse effects include lowering the value of such property and interfering with the use and enjoyment of the property.

54.    The injuries in this case are directly traceable to U.S. EPA's unlawful approval of Ohio's invalid 2018 impaired waters list and priority ranking for western Lake Erie, as well as its decision to indefinitely defer a TMDL for western Lake Erie.  Ohio EPA failed to reasonably follow its own process for deferring a TMDL for western Lake Erie while pursuing an alternative approach, and thus had no valid basis for ranking western Lake Erie a low priority for a TMDL. U.S. EPA therefore acted arbitrarily, capriciously, and not in accordance with law when it approved Ohio's categorization and priority ranking for western Lake Erie.  U.S. EPA was also required to recognize Ohio EPA's "constructive submission" of no TMDL.

55.    A TMDL for Lake Erie is key to actually restoring the water quality of the lake. A TMDL would set a cap on the amount of phosphorus pollution that is driving harmful algal blooms on western Lake Erie, and would allocate that total cap to limit pollution loads from particular sources.  The development of such allocations would produce vital information identifying specific "hotspot" regions of phosphorus discharges as targets for ongoing and future federal, state, and local efforts to reduce pollution.

56.    A TMDL could include specific allocations to "point sources" that are directly subject to permit requirements and other regulations under the CWA.  These would include allocations to concentrated animal feeding operations that are a source of phosphorus pollution in Lake Erie due to manure discharges.  Such allocations would serve as a basis for more stringent

10

limits on manure disposal practices and discharges through legally enforceable CWA permits.

57.     Under existing U.S. EPA guidance, a TMDL would have to include "reasonable assurances" that planned efforts would sufficiently reduce phosphorus pollution to meet the overall phosphorus cap for western Lake Erie. To comply with that requirement, the TMDL would need to include information demonstrating that planned phosphorus reduction efforts would in fact be sufficient to meet the cap, as well as accountability mechanisms to provide specific consequences or further steps if those planned phosphorus reductions were not achieved.

58.     A TMDL could also account for phosphorus loadings from multiple jurisdictions, including Indiana and Michigan, to ensure that phosphorus contributions from states other than Ohio are addressed through available legal and regulatory tools.

59.     U.S. EPA would need to review and approve an Ohio TMDL, including any reasonable assurance mechanism, or develop a TMDL itself if Ohio fails to do so.  This would result in a final U.S. EPA action subject to judicial review.  That judicial review would provide a key venue for transparency and accountability regarding the merits of any plan to reduce phosphorus pollution in western Lake Erie.

60.     However, as a result of U.S. EPA's decision to approve Ohio EPA's indefinite deferral of a TMDL without having developed an alternative plan, no comprehensive TMDL will be established to address harmful algal blooms in western Lake Erie, and no "reasonable assurances" will be made regarding the likely effectiveness of efforts to reduce phosphorus loading into western Lake Erie. Thus, phosphorus loading and the resulting harmful algal blooms will continue to harm Plaintiffs and their members.

61.     U.S. EPA's unlawful approval of Ohio EPA's refusal to develop a TMDL for western Lake Erie inhibits the protection of water quality and thwarts important pollution

11

regulation that would have reduced and abated the injuries to Plaintiffs and their members.

62.     Plaintiffs and their members are also suffering informational and procedural injuries resulting from U.S. EPA's unlawful approval of Ohio's refusal to develop a TMDL for western Lake Erie. Through the pollution load allocation process, a TMDL would provide important information to the public, policymakers, and pollution sources themselves regarding specific sources of phosphorus pollution and key geographic areas for targeting efforts to reduce phosphorus loading.  Additionally, Ohio's process for developing a TMDL under Ohio Revised Code sections 6111.561-6111.563 would provide Plaintiffs and their members a formal legal process for participating and providing input in the development of a TMDL.

63.     The injuries to Plaintiffs and their members can be redressed by the declaratory and injunctive relief sought herein, which would require U.S. EPA to disapprove Ohio EPA's 2018 impaired waters listing and priority ranking for the western Lake Erie LEAUs and hold Ohio EPA to its obligation to address harmful algal blooms in western Lake Erie under the Clean Water Act.

64.     As detailed above, a TMDL in this case will help prevent, extinguish, manage, and/or reduce the injuries alleged herein by providing important regulatory, informational, and procedural tools to reduce phosphorus pollution driving harmful algal blooms in western Lake Erie.

## STATEMENT OF THE CASE

### Legal Background

Impairment Determination and Establishment of a TMDL

65.     The Clean Water Act serves "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a).

66.    Under the CWA, states must develop water quality standards that "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." CWA § 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A).

67.    Under the Clean Water Act and its implementing regulations, a state must develop a list every two years of every water body within its jurisdiction that does not attain its designated uses.  CWA § 303(d)(1)(A), 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7.  States must do so by evaluating whether existing pollution controls "are not stringent enough to implement any water quality standard applicable to such waters."  33 U.S.C. § 1313(d)(1)(A).  States must develop a comprehensive list of all waterbodies identified during this evaluation, referred to herein as an "impaired waters list."

68.    The CWA mandates that states submit their proposed impaired waters lists to U.S. EPA for its approval.  33 U.S.C. § 1313(d)(2).  U.S. EPA must approve or disapprove a state's proposed impaired waters list before it may go into effect.  *Id.*

69.    Section 303(d) of the Clean Water Act provides that when a state identifies waters within its jurisdiction that are impaired by pollution, "[t]he State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters."  33 U.S.C. § 1313(d)(1)(A); *see also* 40 C.F.R. § 130.7(b)(4) (similar).

70.    The impaired waters list and priority rankings must be accompanied by documentation – typically titled an "Integrated Report" – that provides the underlying water quality assessment and rationale for the state's ultimate determinations.  40 C.F.R. § 130.7(b)(6).

71.    A state must submit its biennial impaired waters list and priority rankings for review by U.S. EPA under 40 C.F.R. § 130.7.  U.S. EPA may approve the list "only if it meets the requirements of § 130.7(b)," including the requirement for the state to "provide

13

documentation . . . to support the State's determination to list or not to list its waters as required by §§ 130.7(b)(1) and 130.7(b)(2)."  40 C.F.R. § 130.7(d)(2), (b)(6).

72.     After identifying impaired waters and their respective priority rankings, "[e]ach State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation."  33 U.S.C. § 1313(d)(1)(C); *see also* 40 C.F.R. § 130.7(c)(1) (similar).  That "load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality."  33 U.S.C. § 1313(d)(1)(C).

73.     U.S. EPA regulations specify that this TMDL requirement applies to all waters within a state's boundaries for which existing pollution control mechanisms "are not stringent enough to implement any water quality standards (WQS) applicable to such waters."  40 C.F.R. § 130.7(b)(1).  Such existing mechanisms that may provide a basis for determining that a TMDL is not required include not only "technology-based effluent limitations" on point sources, but also "[m]ore stringent effluent limitations (including prohibitions) required by either State or local authority preserved by section 510 of the Act, or Federal authority (law, regulation, or treaty)," and "[o]ther pollution control requirements (e.g., best management practices) required by local, State, or Federal authority."  *Id.*

74.     U.S. EPA regulations define a TMDL as "[t]he sum of the individual WLAs [wasteload allocations] for point sources and LAs [load allocations] for non point sources and natural background."  40 C.F.R. § 130.2(i).

14

75.     A "wasteload allocation" is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." 40 C.F.R. § 130.2(h). Any Clean Water Act permit for a point source must include pollution limits "consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7." 40 C.F.R. § 122.44(d)(1)(vii)(B).

76.     A "load allocation" is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g). Such allocations are "best estimates of the loading, which may range from reasonably accurate estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading." *Id.*

77.     U.S. EPA's own regulations recognize that "[i]f Best Management Practices (BMPs) or other nonpoint source pollution controls make more stringent load allocations practicable, then waste load allocations can be made less stringent. Thus, the TMDL process provides for nonpoint source control tradeoffs." 40 C.F.R. § 130.2(i).

78.     The calculations underlying a TMDL "shall be subject to public review." 40 C.F.R. § 130.7(c)(1)(ii). Ohio Revised Code sections 6111.561-6111.563 provide a specific process for public input and comment during the development of a TMDL.

79.     Each state must submit TMDLs established for impaired waters to U.S. EPA for review. 33 U.S.C. § 1313(d)(2). U.S. EPA's implementing regulations provide that "[s]chedules for submission of TMDLs shall be determined by the Regional Administrator and the State." 40 C.F.R. § 130.7(d).

80.     U.S. EPA "shall either approve or disapprove" a TMDL "not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

15

81.     A number of federal courts have endorsed the doctrine of "constructive submission," which treats a state's affirmative decision not to develop a TMDL as the equivalent of a submission of *no* TMDL, triggering U.S. EPA's obligation to review that "non-submission" under 33 U.S.C. § 1313(d)(2).  *See, e.g.*, *Scott v. City of Hammond*, 741 F.2d 992 (7th Cir. 1984).

82.     If U.S. EPA approves a TMDL, the state must incorporate the TMDL into its "continuing planning process" for implementing the Clean Water Act under section 303(e), also known as a "water quality management" plan.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2); 40 C.F.R. § 130.2(k) (definition of water quality management plan).

83.     If U.S. EPA disapproves a submitted TMDL, the U.S. EPA Administrator "shall not later than thirty days after the date of such disapproval . . . establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such . . . establishment the State shall incorporate them into its current plan under subsection (e) of this section."  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2) (similar).

<u>U.S. EPA Guidance on Impairment Assessments and Priority Rankings</u>

84.     Dating back to 1991, U.S. EPA has issued public guidance documents regarding the implementation of the Clean Water Act, including CWA section 303 and 40 C.F.R. § 130.7.

85.     A 2001 U.S. EPA guidance document provides direction to the States as to how to "report to EPA the water quality standard attainment status of all AUs [assessment units] in their jurisdiction."  U.S. EPA, 2002 Integrated Water Quality Monitoring and Assessment Report Guidance at 5 (Nov. 19, 2001), *available at* https://www.epa.gov/sites/production/files/2015-10/documents/2002_02_13_tmdl_2002wqma.pdf.  "Each AU should be placed in only one of the five unique assessment categories," which are: (1) Attaining the water quality standard and no

16

use is threatened; (2) Attaining some of the designated uses; no use is threatened; and insufficient or no data and information is available to determine if the remaining uses are attained or threatened; (3) Insufficient or no data and information to determine if any designated use is attained; (4) Impaired or threatened for one or more designated uses but does not require the development of a TMDL (e.g., if the impairment is not the result of a pollutant); and (5) The water quality standard is not attained.  *Id.* at 6.

86.    In 2015, U.S. EPA issued guidance ("2015 Integrated Report Guidance") purporting to identify an optional new subcategory for classifying assessed waters, Category "5-alternative" or "5-alt."  This subcategory would apply where a water body was "[i]mpaired without a TMDL completed but assigned a low priority for TMDL development because an alternative restoration approach is being pursued."  U.S. EPA, Information Concerning 2016 Clean Water Act Sections 303(d), 305(b), and 314 Integrated Reporting and Listing Decisions at 9 (Aug. 13, 2015), *available at*  https://www.epa.gov/sites/production/files/2015-10/documents/2016-ir-memo-and-cover-memo-8_13_2015.pdf. The guidance explained that "EPA has created an optional subcategory under Category 5— subcategory 5-alternative—as an organizing tool to clearly articulate which listed waters have such alternative approaches, and to provide transparency to the public. In addition, this subcategory will facilitate tracking alternative restoration approaches in these CWA 303(d) listed waters."  *Id.* at 7.

87.    U.S. EPA defined an "alternative restoration approach" as "a near-term plan, or description of actions, with a schedule and milestones, that is more immediately beneficial or practicable to achieving WQS."  *Id.* at 4.

88.    The 2015 Integrated Report Guidance states that "[o]nce a State decides to pursue an alternative restoration approach for impaired waters, EPA requests that the State provide, or

17

reference, in its Integrated Report a description of the approach. Such description will provide

transparency to the public and help facilitate State and EPA discussions on whether EPA will

include the alternative restoration approach under the CWA 303(d) performance measures." *Id.*

at 6. U.S. EPA identified specific elements for the State to consider in such a description,

including:

- "Analysis to support why the State believes that the implementation of the alternative restoration approach is expected to achieve WQS";

- "An Action Plan or Implementation Plan to document: a) the actions to address all sources—both point and nonpoint sources, as appropriate—necessary to achieve WQS (this may include e.g., commitments to adjust permit limits when permits are re-issued or a list of nonpoint source conservation practices or BMPs to be implemented, as part of the alternative restoration approach); and, b) a schedule of actions designed to meet WQS with clear milestones and dates, which includes interim milestones and target dates with clear deliverables";

- "Plans for effectiveness monitoring to: demonstrate progress made toward achieving WQS following implementation; identify needed improvement for adaptive management as the project progresses; and evaluate the success of actions and outcome"; and

- "Commitment to periodically evaluate the alternative restoration approach to determine if it is on track to be more immediately beneficial or practicable in achieving WQS than pursuing the TMDL approach in the near-term, and if the impaired water should be assigned a higher priority for TMDL development."

*Id.*

89.    For any water listed in Category 5 as impaired, U.S. EPA guidance requires that

the water "must receive a clear priority ranking, which EPA recommends be either in the form of

a scheduled TMDL completion date or a ranking such as high, medium, or low." U.S. EPA,

Guidance for 2006 Assessment, Listing and Reporting Requirements Pursuant to Sections

303(d), 305(b) and 314 of the Clean Water Act at 63 (July 29, 2005), *available*

*at* https://www.epa.gov/sites/production/files/2015-10/documents/2006irg-report.pdf.

90.     U.S. EPA has stated that "[i]f the State chooses not to develop the needed TMDLs for appropriate pollutants on a timely basis or, if the TMDLs are unacceptable to EPA, EPA has a role under the Act to develop the TMDLs in cooperation with the State." Assessment and Watershed Protection Division, U.S. EPA, Guidance for Water Quality-based Decisions: The TMDL Process at 33 (Apr. 1991).

91.     U.S. EPA guidance also states that, "before approving a TMDL in which some of the load reductions are allocated to nonpoint sources in lieu of additional load reductions allocated to point sources, there must be specific assurances that the nonpoint source reductions will in fact occur." U.S. EPA, Guidance for Water Quality-based Decisions: The TMDL Process at 2 (Apr. 1991). "In order to allocate loads among both point and nonpoint sources, there must be reasonable assurances that nonpoint source reduction will in fact be achieved. Where there are not reasonable assurances, under the CWA, the entire load reduction must be assigned to point sources." Assessment and Watershed Protection Division, U.S. E.P.A., Guidance for Water Quality-based Decisions: The TMDL Process at 15 (Apr. 1999).

92.     U.S. EPA's 1999 Protocol for Developing Nutrient TMDLs recommends that minimum submittal information for a nutrient TMDL include a detailed "implementation plan" if "necessary to provide reasonable assurance that the load allocations contained in the TMDL will be achieved." Assessment and Watershed Protection Division, U.S. EPA, Protocol for Developing Nutrient TMDLs at 9-2 (Nov. 1999). The same document describes "reasonable assurance" as "a high degree of confidence that wasteload allocations and/or load allocations in TMDLs will be implemented by Federal, State or local authorities and/or voluntary action. . . . For nonpoint sources, reasonable assurance means that nonpoint source controls are specific to the pollutant of concern, implemented according to an expeditious schedule and supported by

reliable delivery mechanisms and adequate funding."  Assessment and Watershed Protection

Division, U.S. EPA, Protocol for Developing Nutrient TMDLs at 7-5 (Nov. 1999).

93.  The "reasonable assurances" provided in a TMDL may include substantive

consequences and backstop measures if a state does not achieve projected nonpoint source

reductions in accordance with the plan.  For example, a TMDL established by U.S. EPA for

Chesapeake Bay, an estuary along the Atlantic coast with a six-state watershed, includes an

entire "Reasonable Assurance and Accountability Framework" that specifies actions that U.S.

EPA may take within its federal authority if states fail to implement the TMDL.  These include:

(1) expanding CWA permit coverage more broadly to cover more sources and increasing

oversight of permit development to ensure all permits meet CWA requirements; (2) establishing

finer-scale wasteload and load allocations to target more specific sources and regions; (3)

requiring additional pollution reductions from point sources; (4) increasing and targeting federal

CWA enforcement in the watershed; and conditioning or redirecting U.S. EPA grants for state

CWA implementation.  *See* Section 7. Reasonable Assurance and Accountability Framework,

Chesapeake Bay TMDL, 7-12 (2010), https://www.epa.gov/sites/production/files/2014-

12/documents/cbay_final_tmdl_section_7_final_0.pdf.


**Factual Background**

94.  Western Lake Erie has suffered from recurring harmful algal blooms for years,

caused primarily by fertilizer and manure runoff from agricultural sources.  That fertilizer and

manure runoff contains high levels of nutrients, particularly phosphorus, that drive out-of-control

algae growth in the summer and fall.  Significant algae outbreaks in western Lake Erie date back

to 2003, and major blooms have occurred in most years since 2008. *See* 2018 Integrated Report at F-35.

95.     Ohio EPA only designated isolated "Lake Erie Assessment Units" as impaired due to harmful algal blooms starting in 2014, and only fully designated all western Lake Erie LEAUs as Category 5 impaired waters in May 2018. Ohio EPA submitted the May 2018 impairment designation as an amendment to its 2016 Integrated Report in order to resolve a prior lawsuit by ELPC and ACLE. These years of delay regarding an impairment determination have in turn delayed the triggering of the requirement to establish a TMDL for western Lake Erie.

96.     Ohio EPA determines priority rankings for Category 5 impaired waters based on a rubric for assigning "priority points," while also considering other qualitative factors. 2018 Integrated Report at J-4 to J-5. The 2016 Integrated Report Amendment assigned the different western Lake Erie LEAUs between 8 and 10 priority points, but stated that "[t]he priority points in the revised list of impaired waters, while somewhat high, do not reflect the actual priority that Ohio places on the Lake Erie impairments. In short, the western basin in particular is *one of the highest, if not the highest, priority for Ohio to address*." 2016 Integrated Report Amendment at 9, L-31 (emphasis added).

97.     When Ohio EPA released its 2018 Integrated Report a month later, it again designated western Lake Erie as a Category 5 impaired water. Ohio EPA assigned the various western Lake Erie LEAUs between 10 and 17 priority points, with the Lake Erie Western Basin Shoreline scoring highest of the more than a thousand water bodies on Ohio EPA's 2018 impairment list. 2018 Integrated Report at L-44. The 2018 Integrated Report reiterated that "the western basin load reductions [of phosphorus] are a priority for the agency and the State" and called western Lake Erie "a high priority for action." *Id.* at D-31.

21

98.     However, Ohio EPA altered its May 2018 priority ranking to assign western Lake Erie a "low" priority for TMDL development.  2018 Integrated Report at J-3.  As a basis for that ranking, Ohio EPA restated its intent to address harmful algal blooms in western Lake Erie through alternative approaches, including "nutrient TMDLs on tributaries; numerous state initiatives to reduce nutrient loads from Ohio in accordance with the Domestic Action Plan; and active participation on Annex 4 (Nutrients) and other Great Lakes Water Quality Agreement (GLWQA) efforts."  *Id*. at J-10.

99.     Ohio EPA designates any water on its impaired waters list as Category "5," but as of 2016 Ohio EPA added a subcategory "5-alternative," or "5-alt" for impaired waters being addressed through "alternative restoration approaches," consistent with U.S. EPA's 2015 Integrated Report Guidance.  2018 Integrated Report at J-1 to J-2.

100.     Despite citing these alternative approaches as a basis for now assigning western Lake Erie a low priority for a TMDL, Ohio EPA did not follow its established process for designating a water as Category 5-alternative based on a decision to pursue alternative restoration approaches.  In fact, Ohio EPA expressly acknowledged that, "[w]hile Ohio EPA believes that the Domestic Action Plan in conjunction with our other initiatives form the basis of an alternative plan, we . . . have not yet developed a formal 5-alt proposal to submit to U.S. EPA."  2018 Integrated Report at D-35.

101.     The GLWQA and other measures cited by Ohio EPA are not adequate substitutes for a western Lake Erie TMDL.  They do not include any binding schedule, milestones, or viable plan for effectively reducing phosphorus loads in western Lake Erie to meet Ohio's 2020 and 2025 targets. On their own, they will not put a stop to excess nutrient pollution or harmful algal blooms.

102.     Annex 4 of the GLWQA, which addresses nutrient pollution in Lake Erie, lacks

any mechanisms for enforcement, public accountability, or judicial review. Moreover, while

Ohio has committed to achieving phosphorus reduction targets through a "Domestic Action

Plan" under Annex 4, there is no evidence that Ohio is on course to meet either its 2020 interim

targets or its 2025 final targets.

103.     In fact, the State has recognized on multiple occasions that its current efforts are

not likely to prove sufficient to achieve the phosphorus reductions required to address harmful

algal blooms in western Lake Erie.  *See, e.g.*, Press Release, Gov. John Kasich, Kasich

Administration Takes Aggressive New Action to Reduce Nutrient Runoff and Improve Lake Erie

Water Quality (July 11, 2018) (stating that "more aggressive action is needed" beyond past efforts in

order "to reduce or eliminate the algae blooms that have marred the western basin for years"); Ohio

EPA, 2017 Western Lake Erie Monitoring Study Shows High Phosphorus Levels (Apr. 2, 2018),

http://www.epa.state.oh.us/News/OnlineNewsRoom/NewsReleases/TabId/6596/ArticleId/1302/l

anguage/en-US/2017-western-lake-erie-monitoring-study-shows-high-phosphorous-levels.aspx

 (stating that prior efforts have not "moved the needle" in reducing phosphorus loading to

western Lake Erie); Marion Renault, *Ohio has 'long way to go' to solve Lake*

*Erie's algae problem, state officials say*, THE COLUMBUS DISPATCH (Apr. 29, 2018).

104.     Existing TMDLs for tributary bodies of water likewise are not adequate to protect

western Lake Erie.  U.S. EPA recently issued a report that translated Annex 4 nutrient targets for

western Lake Erie into specific nutrient loading targets for tributaries throughout the watershed.

It used the Maumee River Basin, which is primarily located within the state of Ohio and empties

into western Lake Erie, as a case study to find that existing TMDLs for the tributary watersheds

are insufficient to meet the Annex 4 Nutrient Targets, and lack any limits on the specific type of

23

phosphorus – soluble reactive phosphorus – commonly cited as the most significant driver of algae growth in western Lake Erie. U.S. EPA, Methodology for Connecting Annex 4 Watershed Quality Targets with TMDLs in the Maumee River Basin (August 2018), *available at* https://www.epa.gov/tmdl/methodology-connecting-annex-4-water-quality-targets-tmdls-maumee-river-basin.

105.    Existing legal measures and programs are therefore insufficient to significantly reduce the nutrient pollution problem and the algal blooms they cause.

106.    Additionally, Ohio EPA has admitted that it "ha[s] not yet developed a formal" alternative plan for review by U.S. EPA as an alternative to a TMDL. 2018 Integrated Report at D-35.

107.    U.S. EPA approved Ohio EPA's 2018 impaired waters list in a letter and accompanying decision document dated July 9, 2018. In this document, U.S. EPA approved Ohio EPA's list designating the western Lake Erie LEAUs as Category 5. 2018 Integrated Report Approval at 1. The approval decision document explained that "EPA is taking action on the list of Category 5 waters for which available data and/or information indicate that at least one designated use is not being supported or is threatened, and for which a TMDL is still required." 2018 Integrated Report Approval, Decision Document at 20.

108.    U.S. EPA also determined that Ohio EPA "has satisfied the requirement to submit a priority ranking consistent with [U.S.] EPA's regulations." 2018 Integrated Report Approval, Decision Document at 17. U.S. EPA specifically addressed Ohio EPA's treatment of western Lake Erie, noting that the 2018 Integrated Report provided an explanation of "why a TMDL is not being pursued for the Lake immediately, and that it clearly indicates the western basin load reductions are a priority for the agency and the State. [U.S.] EPA finds these responses to be

reasonable, and concludes that Ohio EPA has satisfied the requirement to submit a priority

ranking for Lake Erie consistent with the regulations at 40 C.F.R. §130.7(b)(4)." *Id.* at 18.

109.     U.S. EPA's decision document expressly relied on Ohio EPA's representation that

where its "current efforts to reduce nutrient pollution into Lake Erie, including TMDL development

for the Lake's tributaries, are not sufficient to achieve standards, 'Ohio will be

working with U.S. EPA and other partners to determine next steps.'"  2018 Integrated Report

Approval, Decision Document at 18.  The 2018 Integrated Report Approval indicated that "[U.S.]

EPA expects that under those circumstances such 'next steps' would include TMDL development for

the Lake Erie Assessment Units directly." *Id.*  However, neither U.S. EPA nor Ohio EPA has

committed to any timeline or substantive process for assessing whether alternative approaches are

proving effective or if a TMDL is necessary.

110.     Overall, U.S. EPA's approval of Ohio's 2018 impaired waters list and priority

rankings effectively endorsed Ohio EPA's decision to defer a TMDL for western Lake Erie by

assigning it a "low" priority based on the existence of an alternative plan, despite Ohio EPA's

admission that it had "not yet developed" such a plan "to submit to U.S. EPA."  2018 Section 303(d)

List at D-35.

111.     As a result, Ohio EPA was able to alter its priority ranking for western Lake Erie

to a "low" priority for a TMDL despite having stated western Lake Erie was "one of the highest"

priorities for the State to address just a month prior.  This improper change in the western Lake

Erie priority ranking operates to delay Ohio EPA's obligation to prepare a TMDL "in accordance

with" that priority ranking pursuant to 33 U.S.C. § 1313(d)(1)(C) and 40 C.F.R. § 130.7(c)(1).

112.     A TMDL for western Lake Erie, developed with oversight by U.S. EPA, the

public, and if necessary the courts, is needed to integrate existing efforts into a holistic approach

that can truly control and limit nutrient pollution.

113.     A TMDL would set a cap on the amount of phosphorus pollution that is driving harmful algal blooms on western Lake Erie, and would allocate that total cap to limit pollution loads from particular sources.  The development of such allocations would produce important information identifying specific "hotspot" regions of phosphorus discharges as targets for ongoing and future state and federal efforts to reduce pollution.

114.     A TMDL could include specific allocations to "point sources" that are directly subject to permit requirements and other regulations under the CWA.  These would include allocations to concentrated animal feeding operations that are a source of phosphorus pollution in Lake Erie due to manure discharges.  Such allocations would serve as a basis for more stringent limits on manure disposal practices and discharges through legally enforceable Clean Water Act permits.

115.     Under existing U.S. EPA guidance, a TMDL would have to include "reasonable assurances" that planned efforts would sufficiently reduce phosphorus pollution to meet the overall phosphorus cap for western Lake Erie. To comply with that requirement, the TMDL would need to include information demonstrating that planned phosphorus reduction efforts would in fact be sufficient to meet the cap, as well as accountability mechanisms to provide specific consequences or further steps if those planned phosphorus reductions were not achieved.

116.     U.S. EPA would need to review and approve an Ohio TMDL, including any reasonable assurance mechanism, or develop a TMDL itself if Ohio fails to do so.  This would result in a final U.S. EPA action subject to judicial review.  That judicial review would provide a key venue for transparency and accountability for any plan to reduce phosphorus pollution in western Lake Erie.

117.     The need for a western Lake Erie TMDL is especially urgent as recent reports

26

released by the US government itself demonstrate that the algal blooms and nutrient pollution problems that plague the Midwest and Ohio in particular are likely to be exacerbated by climate change.

118.     The most recent National Climate Assessment notes that "[t]he occurrence of conditions that encourage cyanobacteria growth, such as higher water temperatures, increased runoff, and nutrient-rich habitats, are projected to increase in the Midwest." U.S. Global Change Research Program, 2018: Impacts, Risks and Adaptation in the United States: Fourth National Climate Assessment, Volume II, Chapter 21 Midwest, Key Message 4: Human Health (April 2018), *available at* https://nca2018.globalchange.gov.

119.     Without any effort to develop a comprehensive TMDL for western Lake Erie, including binding deadlines and public accountability for doing so, U.S. EPA and Ohio EPA may indefinitely defer any effective action to stop harmful algae outbreaks in western Lake Erie.

## FIRST CLAIM FOR RELIEF

### (Declaratory and Injunctive Relief Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

120.     Plaintiffs re-allege and incorporate by reference all the allegations set forth above.

121.     Section 303(d)(1)(A) of the CWA requires a State to identify impaired waters within its boundaries. 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7(b). Each state must then submit its proposed impaired waters lists to U.S. EPA for its approval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(b), (d). U.S. EPA must approve or disapprove a State's proposed impaired waters list before it goes into effect. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d).

122.     Section 303(d) of the Clean Water Act also provides that when a state identifies waters within its jurisdiction that are impaired by pollution, "[t]he State shall establish a priority

ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters."  33 U.S.C. § 1313(d)(1)(A); *see also* 40 C.F.R. § 130.7(b)(4) (similar).

123.     U.S. EPA must review a State's proposed impaired waters list and priority rankings under 40 C.F.R. § 130.7.

124.     In the 2018 Integrated Report, Ohio EPA "flip-flopped" on its priority ranking for western Lake Erie as "one of the highest, if not the highest, priority for Ohio to address" among its impaired waters.

125.     Instead, Ohio EPA designated western Lake Erie as a "low" priority for a TMDL.

126.     Ohio EPA justified that "low" priority ranking by citing its decision to pursue an alternative restoration approach.  At the same time, Ohio EPA admitted that it had failed to provide U.S. EPA with a plan for any such alternative restoration approach for review as required for a "Category 5-alternative" listing.  Instead, Ohio EPA listed the western Lake Erie LEAUs as Category 5 impaired waters.

127.     U.S. EPA reviewed and approved these listing and priority ranking decisions pursuant to 40 C.F.R. § 130.7(d)(2) without a reasonable basis.  2018 Integrated Report Approval at 1; 2018 Integrated Report Approval, Decision Document at 17, 18, 20.

128.     Plaintiffs seek relief from these arbitrary, capricious, and illegal actions by U.S. EPA pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### (Declaratory and Injunctive Relief Under the Clean Water Act,
### 33 U.S.C. § 1365(a)(2))

129.     Plaintiffs re-allege and incorporate by reference all the allegations set forth above.

130.     Ohio EPA has decided to indefinitely defer a TMDL for western Lake Erie while

pursuing alternative restoration measures, despite admitting that it does not have any alternative plan in place, and without any timeline for developing a TMDL in the future.

131.    Ohio EPA specifically relied on a legally insufficient and ineffective alternative restoration approach in its 2018 Integrated Report as a basis for changing the western Lake Erie LEAUs from a "high, if not the highest" to a low priority for a TMDL, thereby alleviating its obligation to establish a TMDL on a timeline in accordance with that previous high priority ranking.

132.    These Ohio EPA actions constitute a "constructive submission" of no TMDL, which triggers U.S. EPA's obligation to disapprove such a submission within 30 days pursuant to 33 U.S.C. § 1313(d)(2) and 40 C.F.R. §  130.7(d)(2).

133.    U.S. EPA has not carried out that duty as required by the Clean Water Act.

134.    U.S. EPA has instead approved Ohio's impaired waters list and its flawed priority ranking for western Lake Erie.

135.    U.S. EPA has therefore failed to "perform any act or duty" under the Clean Water Act "which is not discretionary" and is subject to suit under 33 U.S.C. § 1365(a)(2).


## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.  Issue an Order declaring that U.S. EPA's 2018 Integrated Report Approval was arbitrary, capricious, or otherwise not in accordance with the Clean Water Act, and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A);

B.  In the alternative, issue an Order declaring that Ohio EPA has made a "constructive submission" of no TMDL for western Lake Erie based on its refusal to begin developing a

TMDL, , contrary to the requirements of the Clean Water Act, despite admitting it does not have any credible alternative plan in place;

C.  Issue an Order setting a compliance schedule for Ohio EPA, or in the alternative U.S. EPA, to address western Lake Erie's impairment under the Clean Water Act, including binding and expeditious interim deadlines for U.S. EPA to report on Ohio's progress toward meeting its 2020 and 2025 phosphorus reduction commitments, and future plans for meeting those commitments or otherwise addressing harmful algal blooms in western Lake Erie;

D.  Issue an Order retaining jurisdiction of this case to regularly monitor U.S. EPA's application of the Clean Water Act to protect western Lake Erie;

E.   Award attorney's fees and costs to Plaintiffs for their bringing this action; and

F.  Such other relief as this Court deems just and proper.


Respectfully submitted,


s/ Madeline Fleisher
Madeline Fleisher
Environmental Law & Policy Center
21 W. Broad St., 8th Floor
Columbus, OH 43215
Phone: 614-569-3827
Fax: 312-795-3730
mfleisher@elpc.org
(Ohio Bar #: 0091862)

s/ Alda Yuan (consent)
Alda Yuan
Associate Attorney
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
Phone: (312) 795-3724
Fax: (312) 795-3730
ayuan@elpc.org

s/ Jean-Luc Kreitner (consent)
Jean-Luc Kreitner
Associate Attorney
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 795-3725
F: (312) 795-3730
jkreitner@elpc.org

*Attorneys for Plaintiffs*