**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Environmental Law & Policy Center, et al.,        Case No. 3:19CV295

        Plaintiffs

    v.               **ORDER**

United States
  Environmental Protection Agency, et al.,

        Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Board of Lucas County Commissioners,        Case No. 3:19CV873

        Plaintiff

    v.               **ORDER**

United States
  Environmental Protection Agency, et al.,

        Defendants

      These consolidated cases arising under the Clean Water Act (CWA), 33 U.S.C. § 1251, *et seq.*, challenge the United States Environmental Protection Agency's (U.S. EPA) approval of the State of Ohio's 2018 impaired waters list.

      In that list, the Ohio Environmental Protection Agency (Ohio EPA) designated Western Lake Erie as an impaired waterbody, thereby triggering its obligation to create a Total Maximum Daily Load (TMDL) that would limit the amount of phosphorous that can enter the lake. 33 U.S.C. § 1313(d)(1)(C). Rather than fulfill that duty – or begin to take even preliminary steps toward its fulfillment – the state agency explained that Lake Erie was a "low" priority for TMDL

development, and that it would address Lake Erie's impairment through alternative restoration methods, including Ohio's Domestic Action Plan (which sets voluntary phosphorous reduction goals) and collaborative efforts under the Great Lakes Water Quality Agreement (GLWQA).

Plaintiffs in these cases, the Environmental Law & Policy Center (ELPC), Advocates for a Clean Lake Erie, and the Board of Commissioners of Lucas County, Ohio, principally allege that U.S. EPA's approval of the impaired waters list in the face of Ohio's decision not to develop a TMDL violates the CWA. *See* 33 U.S.C. § 1365(a)(2). They also contend that the U.S. EPA's approval of Ohio EPA's priority ranking was arbitrary and capricious and contrary to law, and thus in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 501, *et seq.*

Jurisdiction is proper under 28 U.S.C. § 1331.

Pending are U.S. EPA's motions under Fed. R. Civ. P. 12(b)(6) to dismiss the complaints. (Docs. 18 & 26, *Envtl. Law & Policy Ctr. v. U.S. EPA*, Case No. 3:19CV295 (N.D. Ohio).[1] For the following reasons, I deny the motions.

**Background**

**A. The Clean Water Act**

Congress passed the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA requires states to develop water quality standards that "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A).

**1. The Section 303(d) Impaired Waters List**

Every two years, a state must develop and submit to U.S. EPA a list of those waters within its boundaries for which existing pollution controls are insufficient to meet applicable

---

[1] Unless otherwise noted, citations to the record are to filings in Case No. 3:19CV295.

water quality standards. 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7(d)(1). These waters are known as "water quality limited segments," 40 C.F.R. § 130.2(j), or, more informally, "impaired waters."

After a state identifies the impaired waters within its jurisdiction, it must "establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A). The priority ranking must identify those waters that are targeted for a TMDL within the next two years. 40 C.F.R. § 130.7(b)(4).

Once the list is complete, the state must submit it to U.S. EPA for approval or disapproval. 33 U.S.C. § 1313(d)(2). U.S. EPA "shall approve a list" within thirty days "only if it meets the requirements of § 130.7(b)" – that is, if the list identifies impaired waters, includes a priority ranking, and contains documentation showing why the state did or did not list a given body of water as impaired. 40 C.F.R. § 130.7(d)(2).

## 2. Duty to Develop TMDLs

A TMDL is a plan that sets the quantity of a pollutant that can enter a receiving water without exceeding applicable water quality standards. 33 U.S.C. § 1313(d)(1)(C). In accordance with the state's priority ranking, a state "shall establish TMDLs" for each waterbody identified on its § 303(d) list and submit them to U.S. EPA for review. 40 C.F.R. §130.7(c)(1).

There is no deadline for submitting TMDLs. Rather, TMDLs "shall continue to be submitted to EPA for review and approval," and "[s]chedules for submission of TMDLs shall be determined by the [U.S. EPA] Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1). U.S. EPA guidance documents suggest that states should establish TMDLs within "8 to 13 years from the date of the original listing" of a particular waterbody as impaired. (Doc. 18–2, PageID

172; *Guidance for 2006 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d), 305(b) and 314 of the Clean Water Act*).

U.S. EPA must approve or disapprove the submission within thirty days. 33 U.S.C. § 1313(d)(2). If U.S. EPA disapproves the submission, it must establish its own TMDL within thirty days of the disapproval. 40 C.F.R. § 130.7(d)(2).

The agency has issued guidance documents that help states accurately report "the water quality standard attainment status of all [assessment units] in their jurisdiction." (Doc. 1, PageID 18 at ¶85 (citing *2002 Integrated Water Quality Monitoring & Assessment Report Guidance*, at 5)). These materials suggest that a state should place each assessment unit – *i.e.*, each body of water in its jurisdiction – in one of five categories:

> 1) attaining the water quality standard and no use is threatened; 2) attaining some of the designated uses; no use is threatened; and insufficient or no data information is available to determine if the remaining uses are attained or threatened; 3) insufficient or no data and information to determine if any designated use is attained; 4) impaired or threatened for one or more designated uses but does not require the development of a TMDL (such as when the impairment is not the result of a pollutant); and 5) the water quality is not attained.

(*Id.*, PageID 18–19 (citing *2002 Integrated Water Quality Monitoring & Assessment Report Guidance* at 6)).

In 2015, U.S. EPA modified this guidance by including a new sub-category, "Category 5-alternative."

This sub-category applies to water bodies that are "[i]mpaired without a TMDL completed but assigned a low priority for TMDL development because an alternative restoration approach is being pursued." (Doc. 1, PageID 19 at ¶86 (citing *Information Concerning 2016 Clean Water Act Section 303(d), 305(b) and 314 Integrated Reporting & Listing Decisions*, at 9)). According to U.S. EPA, this alternative category is "an organizing tool to clearly articulate

4

which waters have such alternative approaches, and to provide transparency to the public" and could help "track[ ] alternative restoration approaches" in § 303(d) impaired waters. (*Id.*).

Under the 2015 Integrated Report Guidance, a state that decides to pursue "an alternative restoration approach for impaired waters" should submit to U.S. EPA a description of that restoration approach. (Doc. 1, PageID 19 at ¶88).

## B. Designating Western Lake Erie as Impaired

Western Lake Erie has "suffered from recurring harmful algal blooms for years, caused primarily by fertilizer and manure runoff from agricultural sources." (Doc. 1, PageID 22 at ¶94). Fertilizer and manure runoff contain "high levels of nutrients, particularly phosphorous, that drive out-of-control algae growth in the summer and fall." (*Id.*). "Significant algae outbreaks in western Lake Erie date back to 2003, and major blooms have occurred in most years since 2008." (*Id.*, PageID 23 at ¶94).

Due to these harmful algal blooms, Ohio EPA designated "isolated 'Lake Erie Assessment Units' as impaired" in 2014. (*Id.*, PageID 23 at ¶95). But "[t]he Ohio EPA has routinely failed to assess Lake Erie's open waters – those beyond the shoreline and drinking water intake areas and site of the recurring toxic algae bloom." *Envtl. Law & Policy Ctr. v. U.S. EPA*, 2018 WL 1740146, *2 (N.D. Ohio 2018) (Carr, J.) (*ELPC I*).[2]

## 1. Ohio's Amended 2016 Report

Ohio EPA did not designate the entirety of western Lake Erie as impaired until May, 2018. (Doc. 1, PageID 23 at ¶95). The designation appeared in an amendment to Ohio EPA's original 2016 Integrated Report, which Ohio submitted to resolve *ELPC I*. The amended 2016 report "assigned the different western Lake Erie LEAUs [Lake Erie Assessment Units] between

---

[2] *ELPC I* was an earlier lawsuit between ELPC and U.S. EPA.

8 and 10 priority points, but stated that 'the priority points in the revised list of impaired waters, while somewhat high, do not reflect the actual priority that Ohio places on the Lake Erie impairment. In short, the western basin in particular is one of the highest, if not the highest, priority for Ohio to address.'" (*Id.*, PageID 23 at ¶96).

## 2. The 2018 Integrated Report

Ohio EPA submitted its 2018 Integrated Report to U.S. EPA in June, 2018.

Once again, the State designated Western Lake Erie as a Category 5 impaired water and assigned the various Western Lake Erie assessment units between 10 and 17 priority points. Notably, the Lake Erie Western Basin Shoreline scored the highest priority of the more than one thousand waterbodies on Ohio's 2018 impairment list. (Doc. 1, PageID 23 at ¶97). The report reiterated that "the western basin load reductions [of phosphorous] are a priority for the agency and the State" and identified Western Lake Erie as "a high priority for action." (*Id.*) (quoting 2018 Integrated Report at D-31).

A key element of the 2018 Integrated Report, and of plaintiffs' claims, is the priority ranking.

In the 2018 report, Ohio EPA identified Western Lake Erie as a "low" priority for a TMDL. (Doc. 1, PageID 24 at ¶98). The agency explained that it intended to address the harmful algal blooms through alternative measures, including "nutrient TMDLs on tributaries; numerous state initiatives to reduce nutrient loads from Ohio in accordance with the Domestic Action Plan; and active participation on Annex 4 (Nutrients) and other Great Lakes Water Quality Agreement (GLWQA) efforts." (*Id.*).

Notwithstanding its plans to proceed with an alternative to a TMDL, Ohio EPA did not designate Western Lake Erie as a "Category 5-alternative," the new designation for impaired

waterbodies not immediately targeted for a TMDL. Nor did it submit to U.S. EPA any description of an alternative restoration approach, as the 2015 U.S. EPA guidance documents permit. While Ohio EPA "believes the Domestic Action Plan in conjunction with [its] other initiatives form the basis of an alternative plan," the agency admitted that it has "not yet developed a formal 5-alt proposal to submit to U.S. EPA." (Doc. 1, PageID 24 at ¶100).

Finally, Ohio EPA has not developed, and has no plans to develop, a TMDL for western Lake Erie. (Doc. 1–7, PageID 66; Doc. 24–2, PageID 363).

U.S. EPA approved Ohio EPA's 2018 impaired waters list on July 9, 2018. (Doc. 1, PageID 26 at ¶107; Doc. 1–7, PageID 48–68).

U.S. EPA also found that Ohio EPA "satisfied the requirement to submit a priority ranking consistent with [U.S.] EPA regulations." (Doc. 1–7, PageID 65). Regarding the State's explanation for not immediately pursuing a TMDL for Western Lake Erie, U.S. EPA remarked that the State "clearly indicates the western basin load reductions are a priority for the agency and the State. [U.S.] EPA finds these responses to be reasonable, and concludes that Ohio EPA has satisfied the requirement to submit a priority ranking for Lake Erie consistent with the regulations at 40 C.F.R. § 130.7(b)(4)." (*Id.*, PageID 66).

### C. Prior Litigation

In 2017, ELPC sued U.S. EPA, challenging its approval of Ohio EPA's 2016 impaired waters list. The 2016 list "explicitly refused to assemble and evaluate all existing and readily available water quality-related data and information" concerning Lake Erie's open waters. *ELPC I, supra*, 2018 WL 1740146 at *2. Despite this textbook violation of Ohio's obligation under 40 C.F.R. § 130.7(b)(5) to assemble and evaluate such data, U.S. EPA "deferred to the State's

judgment not to assess the open waters of the Western Basin of Lake Erie" and approved the list. *Id.*

## 1. Remand Order

On the eve of the deadline for ELPC's summary judgment briefing in *ELPC I*, however, U.S. EPA *sua sponte* notified Ohio EPA that it had "reevaluated [Ohio EPA's] submission and determined that the submission is incomplete and thus not fully consistent with the requirements of Section 303(d) of the Clean Water Act." *ELPC I*, *supra*, 2018 WL 1740146 at *8. U.S. EPA then withdrew its approval decision with respect to Lake Erie's open waters. *Id.*

Because of U.S. EPA's about-face, there was no "final action" for purposes of ELPC's claims under the APA. I therefore denied ELPC's motion for summary judgment, remanded the case to U.S. EPA "for further action consistent with the correct legal standards," and retained jurisdiction. *Id.* at *12–13.

On remand, Ohio EPA submitted an amended 2016 impaired waters list. *Envtl. Law & Policy Ctr. v. U.S. EPA*, 349 F. Supp. 3d 703, 708 (N.D. Ohio 2018) (Carr, J.) (*ELPC II*). This list added three new "lake assessment units" for Lake Erie's open waters and declared them impaired. *Id.* U.S. EPA approved the amended 2016 list on May 10, 2018. *Id.*

The designation of Lake Erie notwithstanding, Ohio EPA stated in the amended report that "it is not going to develop a TMDL for phosphorous runoff in Lake Erie's open waters." *Id.* According to the agency, the best approach for remedying Lake Erie was not the statutorily required TMDL, but "the collaborative process established under . . . the Great Lakes Water Quality Agreement." *Id.* As part of its efforts under the GLWQA, Ohio EPA noted, the State had established "phosphorous reduction goals of 20 percent by 2020, and 40 percent by 2025." *Id.*

## 2. Motion for Leave to Supplement

After U.S. EPA approved the amended 2016 list, ELPC moved for leave to supplement its complaint with two new claims.

The first claim alleged that: 1) U.S. EPA's action was "a final agency decision approving, not only Ohio's amended 2016 impaired waters list, but also the State's professed refusal to develop a TMDL for Lake Erie's open waters"; and 2) this decision was arbitrary and capricious. *ELPC II*, *supra*, 349 F. Supp. 3d at 709.

ELPC's second claim was that Ohio's refusal to develop a TMDL for western Lake Erie amounted to a "constructive submission" of no TMDL. That refusal, according to the complaint, triggered U.S. EPA's duty under 33 U.S.C. § 1313(d)(2) to approve or disapprove the State's "no submission." *Id.* at 714–15.

I concluded that the proposed claims were futile and denied leave to supplement.

Regarding the claim that U.S. EPA had approved Ohio's refusal to develop a TMDL, I held that the agency had approved only the impaired waters list, and not the statements made in the other documents:

> Regulations implementing § 303(d) require states to submit an impaired waters list every two years. 40 C.F.R. § 130.7(d)(1). States need only submit their proposed TMDLs to the EPA Administrator "from time to time." 33 U.S.C. § 1313(d)(2). More specific "[s]chedules for submission of TMDLS [are] determined by the Regional Administrator and the State," rather than federal regulation. 40 C.F.R. § 130.7(d)(1).
>
> Unlike a § 303(d) list, which the federal government might reasonably expect from the states "biennially," *id.*, "TMDLs may require substantial time and resources to develop." *Ohio Valley Envtl. Coal., Inc. v. Pruitt*, 893 F.3d 225, 231 n.4 (4th Cir. 2018); *see also San Francisco BayKeeper*, *supra*, 297 F.3d at 885 ("The development of TMDLs to correct the pollution is obviously a more intensive and time-consuming project than simply identifying the polluted waters."). "EPA guidance [therefore] recommends that states establish TMDLs for all impaired waters on their Section 303(d) Lists within eight-to-thirteen years of the initial listing," while acknowledging that "'slightly longer' times may be

needed depending on specific factors." *Ohio Valley Envtl. Coal.*, *supra*, 893 F.3d at 231 n.4

TMDL submissions also undergo a separate approval process. "Once a state submits a TMDL, EPA must approve or disapprove it within thirty days." *Id.* at 227 (citing 33 U.S.C. § 1313(d)(2)). "If EPA disapproves of a TMDL, EPA must develop, submit for public comment, and finalize its own TMDL within thirty days." *Id.* (citation omitted).

How do I know the U.S. EPA's May 10, 2018 letter approves only Ohio's amended 2016 § 303(d) list, and not the TMDL-related remarks the Ohio EPA made in the Amended Submission?

The documents themselves provide the answer.

First, the letter the Ohio EPA included with the Amended Submission identifies the submission as "an amendment to the final Ohio 2016 Integrated Water Quality Monitoring and Assessment Report for U.S. EPA's review and approval under Section 303(d) of the Clean Water Act." (Doc. 30-1, ID 9026).

Second, the Amended Submission itself updates Ohio's 2016 impaired waters list to add a recreational use algal impairment for the open waters of Lake Erie's Western Basin, as well as a public drinking water use impairment for assessment units in the Western Basin, Central Basin, and the Sandusky Bay due to microcystin. These designations harmonize with the State's responsibilities in § 303(d) to "identify those waters within its boundaries for which [current] effluent limitations ... are not stringent enough to implement ... water quality standards applicable to such waters," 33 U.S.C. § 1313(d)(1)(A), including Ohio's narrative water quality criteria for "nuisance growth of aquatic weeds and algae." Ohio Admin. Code § 3745-1-04(E).

Third, the U.S. EPA's May 10, 2018 response letter confirms that its approval relates exclusively to Ohio's § 303(d) amendment:

> Based on Ohio EPA's May 4, 2018 letter and its revised 2016 [Integrated Report], EPA finds that Ohio has met the requirements of Section 303(d) of the CWA.... This supplemental decision constitutes EPA's rationale for approving the remainder of Ohio EPA's 2016 Section 303(d) list, which was the subject of EPA's January 2018 withdrawal letter. Specifically, EPA is approving the list of the open water assessment units of Lake Erie as impaired for the recreational use due to the presence of algae and/or the public drinking water supply use due to microcystin. Consequently, EPA has now approved Ohio's 2016 Section 303(d) list in its entirety.

(Doc. 30-3, ID 9092).

An agency action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process" and if it is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will follow.'" *Jama v. Dep't of Homeland Security*, 760 F.3d 490, 495–96 (6th Cir. 2014).

Plainly, the above language "consummat[es]" the U.S. EPA's decisionmaking process regarding Ohio's 2016 § 303(d) list. Earlier in the letter, the U.S. EPA says just that: "This supplemental decision and the May 2017 decision together complete the EPA's review and approval of Ohio EPA's 2016 CWA Section 303(d) list." (*Id.* at 9091). The letter also determines Ohio's rights and obligations with respect to that list, with the federal Agency "now approv[ing] Ohio's 2016 Section 303(d) list in its entirety." (*Id.* at 9092).

Regarding Ohio's intent to develop (or not develop) a TMDL, on the other hand, the U.S. EPA's May 10, 2018 response says nothing.

If the Agency signals its final approval of a § 303(d) list by specifying that "[t]his decision ... complete[s] the EPA's review and approval of Ohio EPA's ... Section 303(d) list," one might assume it would use equivalent language to communicate an equally final approval of a state's TMDL plans. Yet the U.S. EPA used no such language relative to Ohio's discussion of its plan to substitute the GLWQA process as an alternative to the TMDL process.

*ELPC II*, *supra*, 349 F. Supp. 3d at 710–11.

I then found that ELPC did not state a plausible constructive submission claim.

As I explained, "[t]he constructive submission doctrine is premised on the U.S. EPA's statutory duty to act on a state's TMDL submission within thirty days." *ELPC II*, *supra*, 349 F. Supp. 3d at 713. If a state "fails over a long period [of] time to submit proposed TMDLs, this prolonged failure may amount to the constructive submission by that state of no TMDL." *Id.*

In rejecting ELPC's arguments, I stressed that "it has been but a few months since Ohio first declared Lake Erie's open waters impaired on May 4, 2018." *Id.* at 713. While "[y]ears of inaction following an impaired listing may reasonably prompt a court to consider whether a state has clearly and unambiguously abandoned its TMDL obligation," I recognized that "[m]onths of inaction will not" support a constructive submission claim. *Id.* at 715.

I also concluded that ELPC could not "transform months [of inaction] into years by casting Ohio's no-TMDL statements as part of the State's broader history of lax environmental action." *Id.* Although there was no question that Ohio had been "tardy" in designating Lake Erie as impaired only in 2018, I concluded that the State "still has a long period of time to sit on its hands before plaintiffs can plausibly allege that it has constructively submitted no TMDLs." *Id.*

Finally, I held that Ohio's expressed intent to follow the GLWQA, "instead of turning forthwith to developing a TMDL," did not support a different result. Rather, "Ohio's preference for the GLWQA collaborative process for now simply is not the same as a clear and unambiguous statement of intent never to perform that duty." *Id.* at 716.

### D. Current Litigation

### 1. ELPC's Complaint

In February, 2019, ELPC sued U.S. EPA again, this time challenging its approval of Ohio EPA's 2018 impaired waters list and the attendant priority ranking.

Count one alleges that U.S. EPA violated § 706(2)(A) of the APA.

ELPC claims that U.S. EPA's approval of Ohio EPA's priority ranking was arbitrary and capricious. It contends that Ohio EPA "flip-flopped on its priority ranking" for Western Lake Erie: whereas, in its amended 2016 Integrated Report, the agency had identified Western Lake Erie as "one of the highest, if not the highest, priority for Ohio to address," Ohio EPA's 2018 Integrated Report designated western Lake Erie as only a "low priority" for development of a TMDL. (Doc. 1, PageID 30 at ¶¶124–25).

Count two alleges that Ohio EPA's decision to "indefinitely defer a TMDL for western Lake Erie while pursuing alternative resolution measures . . . without any timeline for developing a TMDL in the future" amounts to a constructive submission of no TMDL. (Doc. 1, PageID 30–

31 at ¶130). ELPC claims that this constructive submission triggered U.S. EPA's obligation under 33 U.S.C. § 1313(d)(2) to approve or disapprove that submission. (*Id.*, PageID 31 at ¶132).

### 2. Lucas County's Complaint

The Lucas County Board of Commissioners brought its own suit against U.S. EPA in April, 2019. The Commissioners' two-count complaint asserts the same constructive-submission claim that ELPC has raised. (Doc. 1, PageID 11–12, *Bd. of Lucas Cnty. Comm'rs v. U.S. Envtl. Protection Agency*, Case No. 3:19CV873). It also alleges, in count two, that U.S. EPA violated the APA by failing to disapprove Ohio EPA's "fail[ure] to perform its legal duties under Section 303(d) of the Clean Water Act." (*Id.*, PageID 12 at ¶80).

### 3. U.S. EPA's Motions to Dismiss

U.S. EPA filed motions to dismiss under Fed. R. Civ. P. 12(b)(6) in both cases. I held oral argument on the motions on September 24, 2019. (Doc. 33). After giving the parties the opportunity to file post-hearing supplemental briefs, I took the matter under advisement.

### Discussion

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing the motion, I must "draw all reasonable inferences in favor of [the plaintiff]." *Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016).

### A. Approval of the 2018 Priority Ranking

Count one of ELPC's complaint alleges that U.S. EPA's approval of Ohio's 2018 Integrated Report – specifically, the agency's alleged approval of the state's determination to

assign Lake Erie a low priority for development of a TMDL – was arbitrary and capricious. (Doc. 1, PageID 29–31).

### 1. Parties' Arguments

U.S. EPA argues that this count fails to state a claim on which relief may be granted.

The agency maintains that it has no power or authority to approve the merits of a state's priority ranking. Rather, "[w]hen EPA reviews a state's Section 303(d) list, the agency simply confirms that the state has included a priority ranking that, consistent with EPA's regulations, takes into account the severity of the pollution and the uses to be made of such waters." (Doc. 18–1, PageID 149).

U.S. EPA relies heavily on my conclusion in *ELPC II* that the relevant regulation – 40 C.F.R. § 130.7(b)(4), which defines a state's duty to include a priority ranking in its § 303(d) list – "does not authorize the U.S. EPA to review or pass judgment on a state's priority ranking." *ELPC II*, *supra*, 349 F. Supp. 3d at 712.

ELPC responds that U.S. EPA necessarily has "the power to review the substance of priority rankings to ensure they adequately take into account the severity of pollution and uses of the waters." (Doc. 24, PageID 263). This is so, ELPC maintains, because the CWA instructs that U.S. EPA may approve a state's impaired waters list only if, *inter alia*, it contains a priority ranking that "take[s] into account the severity of the pollution and the uses to be made of [the impaired] waters." 40 C.F.R. § 130.7(d)(2).

ELPC also seeks to distinguish that portion of *ELPC II* where I stated that 40 C.F.R. § 130.7(b)(4) does not authorize U.S. EPA to review or pass judgment on a state's priority ranking. (Doc. 24, PageID 264). It insists that I "made that statement in a very different context, namely, in analyzing whether [U.S. EPA's] approval of [Ohio's 2016 impaired waters list]

constituted a reviewable, final approval of statements in the accompanying report regarding Ohio's TMDL plans." (Doc. 24, PageID 264). I was not saying, ELPC maintains, that "U.S. EPA lacked authority to disapprove lists or integrated reports that violate 130.7(b)(4) or the Clean Water Act." (*Id.*).

## 2. Analysis

"Under the CWA, [Ohio] was required to 'establish a priority ranking for impaired waters, taking into account the severity of the pollution and the uses to be made of such waters.'" *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 917 (11th Cir. 2007) (quoting 33 U.S.C. § 1313(d)(1)(A)).

In this case, Ohio's 2018 Integrated Report purported to designate Western Lake Erie a "low" priority for development of a TMDL.

On review of that report, U.S. EPA found that Ohio EPA's discussion of its "updated priority ranking of [its] impaired waters still requiring TMDLs . . . satisfies the requirement to submit a priority ranking consistent with EPA's regulations." (Doc. 1–7, PageID 48). With regard to Lake Erie's low priority for a TMDL, U.S. EPA specifically explained that:

> The State also referenced the explanation in the [Integrated Report] regarding why a TMDL is not being pursued for the Lake immediately, and that it clearly indicates the western basin load reductions are a priority for the agency and the state. EPA finds these responses to be reasonable, and concludes that Ohio EPA has satisfied the requirement to submit a priority ranking for Lake Erie consistent with the regulations at 40 C.F.R. § 130.7(b)(4).

(*Id.*, PageID 66).

Challenging this action by U.S. EPA, ELPC contends that Ohio EPA, in crafting the statutorily required priority ranking, failed to take into account: 1) "the severity of the pollution" in Lake Erie, which all sides agree – and which Ohio EPA's priority scoring indicates – is badly

impaired due to phosphorous runoff and in need of remediation; and 2) "the uses to be made of such waters" – in this case, the critical use of the lake's waters for drinking water.

Stated another way, ELPC claims that if Ohio EPA had actually considered the severity of the Lake's impairment and the uses to be made of its badly polluted waters, it could not rationally have concluded that Lake Erie is a low priority for a TMDL, nor could U.S. EPA have found that Ohio EPA's priority ranking complied with 33 U.S.C. § 1313(d)(1)(A) and 40 C.F.R. § 130.7(b)(4).

Construing these allegations in the light most favorable to ELPC, I agree that the complaint plausibly alleges a violation of the APA.

### a. ELPC Has Alleged Final Agency Action

First, U.S. EPA's approval letter of July 9, 2018 represents a final agency action approving Ohio's impaired waters list and finding that Ohio EPA submitted a priority ranking in accordance with § 1313(d)(1)(A). *See Jama v. Dep't of Homeland Security*, 760 F.3d 490, 495–96 (6th Cir. 2014) (defining the "final agency action" element of an APA claim).

### b. ELPC Has Alleged a Plausible Violation of U.S. EPA's Obligation to Ensure That Ohio's Priority Ranking "Takes Into Account" Pollution Levels and the Waters' Intended Uses

Second, ELPC's complaint plausibly suggests that U.S. EPA's approval was arbitrary, capricious, and/or contrary to law. *See* 5 U.S.C. § 706(2)(A).

According to Ohio EPA itself, Western Lake Erie is a "high" priority for the state to address, and one of the State's waterbodies that is most in need of remediation. Presumably the agency so concluded from the badly polluted nature of the Lake's waters, the annual recurrence for many years of harmful algal blooms caused by agricultural phosphorous runoff, and the

ensuing threat that these conditions pose to the nearly 500,000 Ohio residents who rely on Lake Erie for drinking water. *See ELPC I*, *supra*, 2018 WL 1740146 at *1–2.

Nevertheless, Ohio EPA designated Lake Erie as a "low" priority for a TMDL.

In seeking dismissal of this claim, U.S. EPA has not pointed to anything in Ohio's Integrated Report or its own July, 2018 approval document tending to show a rational connection between Lake Erie's ranking as a low priority for a TMDL and "the severity of the pollution" and the "uses to be made of" Lake Erie's waters.[3]

To be sure, Ohio's 2018 report sought to justify the low priority by pointing to other measures the State was taking to remediate Lake Erie's impairment. (Doc. 26–3, PageID 464; 2018 Integrated Report at D-31). But the CWA and its implementing regulations at least suggest, if not clearly instruct, that pollution levels and "the uses to be made of such waters," rather than a state's desire to pursue an alternative remediation program, must drive TMDL prioritization.

### c. Courts Can Review Whether U.S. EPA Approved a Priority Ranking That Failed to Consider the Required Factors

Third, at least two courts have recognized that the APA authorizes courts to adjudicate claims alleging violations of the CWA's "take into account" requirement.

In *Sierra Club*, *supra*, 488 F.3d at 917–18, the Eleventh Circuit reversed a district court's judgment that U.S. EPA "had no duty" under the CWA to "approve [a state's] priority ranking" and remanded the case to decide "whether the EPA's decision [approving the priority ranking] is supported by evidence in the administrative record."

---

[3] U.S. EPA's motion to dismiss does not challenge ELPC's allegations that Ohio EPA violated the "take into account" requirement in § 1313(d)(1)(A) and 40 C.F.R. § 130.7(b)(4). Rather, the agency makes only the narrow argument that its duty is simply to determine whether the state included a priority ranking in its submission to U.S. EPA. That argument has no merit, as I explain below.

There Sierra Club argued that Florida's priority ranking of its impaired waters for TMDL development "was arbitrary and capricious" because the state "did not adequately take into account the statutory factors of 'severity of the pollution' and 'uses to be made of such waters.'" *Id.* at 917. In particular, Sierra Club maintained that Florida had improperly designated as low priority "all water segments that are listed [as impaired] before 2010 due to fish consumption advisories for mercury" based on the state's faulty "understanding of mercury cycling in the environment." *Id.*

The district court had found that the CWA imposed "no requirement that the EPA actually approve or disapprove of a state's priority ranking" and granted summary judgment to U.S. EPA. *Id.* The Eleventh Circuit rejected that conclusion

According to the appellate court, the district court had misconstrued Sierra Club's argument as a claim that "EPA has a duty to approve the specific level of ranking assigned by Florida to each WQLS [water quality limited segment]." The Eleventh Circuit found that Sierra Club's "true challenge is to the factors that Florida considered in assigning the designations," and that this claim was reviewable. *Id.* at 918. As the court explained

> The resolution of this issue will involve an examination of whether the EPA's decision is supported by the evidence in the administrative record. We believe that the district court should consider the question in the first instance, particularly in light of the factual matters that it raises.

*Id.*

The court in *Friends of the Wild Swan, Inc. v. U.S. E.P.A.*, 130 F. Supp. 2d 1184 (D. Mont. 1999), reached the same conclusion.

In that case plaintiffs brought an APA claim alleging that U.S. EPA's approval of Montana's 1998 impaired waters list was arbitrary and capricious because the impaired waterbodies "were assigned priorities without proper consideration of the effect of non-point

18

source pollution on Montana's native cold water fisheries." *Friends of the Wild Swan*, *supra*, 130 F. Supp. 2d at 1192. Recognizing that a state has a duty under the CWA "to consider the severity of the pollution in the waterbody and the beneficial uses offered by the waterbody in assigning priority rankings," the district court proceeded to address the claim on the merits. *Id.* at 1194. On a motion for summary judgment, the court held that "EPA's approval of Montana's priority ranking was not arbitrary and capricious." *Id.* at 1194.

These cases point the way to the proper disposition of ELPC's first claim.

Because ELPC alleges, not that Ohio EPA should have assigned Lake Erie a higher priority for TMDL development, but that the agency failed to consider the statutory criteria that drive TMDL development, I have authority to review ELPC's claim. *Sierra Club*, *supra*, 488 F.3d at 917–18; *Friends of the Wild Swan*, *supra*, 130 F. Supp. 2d at 1194.

### d. *ELPC II* Is Not Controlling

Fourth, nothing in my decision in *ELPC II* held or suggested that U.S. EPA lacks the authority under the CWA to determine if a state's priority ranking in fact took into account "the severity of the pollution" and "the uses to be made of" impaired waterbodies.

*ELPC II* considered a claim that is not at issue in this case: whether U.S. EPA's approval of Ohio's amended 2016 Integrated Report was also "a 'final agency action' approving the State's claimed refusal to develop a TMDL." *ELPC II*, *supra*, 349 F. Supp. 3d at 709. ELPC contended that U.S. EPA's finding that Ohio EPA had submitted a satisfactory priority ranking translated into a final agency action approving all statements that Ohio EPA made with respect to its priority ranking, including its decision not to develop a TMDL for Western Lake Erie. In rejecting that claim (on several grounds), I found that 40 C.F.R. § 130.7(b)(4) "does not authorize the U.S. EPA to review or pass judgment on a state's priority ranking." *Id.* at 712.

Contrary to U.S. EPA's argument here, my statement in *ELPC II* does not mean that the agency is powerless to reject an impaired waters list or a priority ranking that violates § 1313(d)(1)(A) and 40 C.F.R. § 130.7(b)(4). Indeed, there was no claim in that case that U.S. EPA acted arbitrarily and capriciously by approving a priority ranking that did not comply with the CWA and its attendant regulations. I would therefore have had no cause to reach such a conclusion.

Rather, the disputed language in *ELPC II* is best understood as a recognition that U.S. EPA lacks the power to review the specific priority assigned to a given waterbody's need for a TMDL. Because plaintiffs' claims here do not take issue with the specific priority ranking that Ohio EPA assigned to Lake Erie, *ELPC II* is not controlling.

In sum, plaintiffs have plausibly alleged that Ohio EPA's priority ranking for Western Lake Erie does not take into account either the severity of the pollution in the Lake or the beneficial uses to be made of its waters. For that reason, ELPC's claim that U.S. EPA's approval of the State's priority ranking was arbitrary, capricious, and contrary to law is plausible. I will therefore deny U.S. EPA's motion to dismiss count one of ELPC's complaint.

### B. Constructive Submission

Count two of ELPC's complaint, as well as count one of the Lucas County Commissioners' complaint, allege that U.S. EPA violated a nondiscretionary duty when it failed to approve or disapprove Ohio EPA's alleged constructive submission of "no TMDL" for Western Lake Erie.[4]

---

[4] Because the plaintiffs' constructive submission claims are substantively identical, I refer, for ease of reading, only to ELPC's arguments and U.S. EPA's arguments in opposition thereto. My reasoning and the result I reach apply equally to the motion to dismiss count one of the Commissioners' complaint.

### 1. Parties' Arguments

U.S. EPA argues that ELPC has not alleged a plausible constructive submission claim.

Relying on *ELPC II*, the agency emphasizes that "a constructive submission 'occurs only when the state's actions clearly and unambiguously demonstrate an intent not to submit any TMDLs.'" (Doc. 18–1, PageID 155 (quoting *ELPC II*, *supra*, 349 F. Supp. 3d at 714)). Here, however, Ohio first designated Lake Erie as impaired in May, 2018. A few weeks later, in June, 2018, Ohio submitted its 2018 Integrated Report – which again listed Lake Erie as impaired, but did not develop (or begin to develop) a TMDL for the Lake.

"Because 'the hands on the TMDL clock have just begun to turn,'" U.S. EPA contends that "[p]laintiffs cannot establish that Ohio has 'clearly and unambiguously refused to submit TMDLs . . . in perpetuity.'" (Doc. 18–1, PageID 156 (quoting *ELPC II*, *supra*, 349 F. Supp. 3d at 715)).

U.S. EPA also contends that much of Ohio EPA's 2018 Integrated Report establishes that the state agency has not disavowed its duty to establish a TMDL for Lake Erie. For example, it points to Ohio's statements that "the western basin is a high priority for action (just not necessarily a lake TMDL)" and that most of Lake Erie's assessment units "need" a TMDL. (Doc. 18–4, PageID 195).

ELPC responds that its constructive-submission claim is plausible enough to survive the defendants' Rule 12(b)(6) motion.

At its core, ELPC's claim rests on four considerations.

First, it contends that Ohio's 2018 Integrated Report "arbitrarily 'flip-flopped' on its priority ranking for western Lake Erie." (Doc. 24, PageID 269). Even though Ohio characterized Lake Erie as "one of the highest" priorities for remediation in the State's 2016 report, the 2018

report designated Lake Erie as a "low priority" for a TMDL. (*Id.*). Because priority rankings "drive[ ] the schedule for completion of TMDLs," ELPC maintains that the downgraded priority ranking "demonstrates the state's intention to stop 'the hands on the TMDL clock.'" (*Id.*) (quoting *ELPC II*, *supra*, 349 F. Supp. 3d at 715).

Second, ELPC emphasizes that Ohio EPA has no "viable alternative" to a TMDL. (Doc. 24, PageID 269). While acknowledging the State's expressed intent to pursue alternative mechanisms (*i.e.*, the Domestic Action Plan and the GLWQA) to remedy Lake Erie, ELPC contends that Ohio's failure to designate Lake Erie as a Category 5-alternative belies the plausibility of these alternative measures. (*Id.*, PageID 269–70).

Third, ELPC observes that Ohio has "declined to commit to preparing a TMDL for Lake Erie even if its (vague and inadequate) alternative plans fail to achieve water quality standards." (Doc. 24, PageID 270).

Fourth, ELPC takes issue with U.S. EPA's determination that Ohio EPA's priority ranking was "reasonable," given that the State's proposed alternative measures are unsupported and undeveloped. (Doc. 24, PageID 270). ELPC contends that U.S. EPA "acknowledged that Ohio's non-TMDL approach might not work . . . but imposed no deadlines or other safeguards to prevent Ohio from indefinitely pursuing it while continuing to flout its statutory obligations to submit a TMDL[.]" (*Id.*).

In reply, U.S. EPA reiterates two main points.

First, it again likens ELPC's claim to the constructive submission claim that I rejected in *ELPC II*.

It notes that Ohio's 2016 report "explained that Ohio would pursue other approaches before turning to a TMDL," and that I concluded that this "strategy to address water quality in

the Lake does not constitute a constructive submission of no TMDL." (Doc. 27, PageID 498).

Likewise, Ohio's 2018 report confirms that "[t]he western basin is a high priority for action (just

not necessarily a lake TMDL)," and that its "efforts will continue as stated in the report." (*Id.*).

For that reason, U.S. EPA argues that "nothing has changed" from *ELPC II* that "would give rise

to a constructive submission of no TMDL." (*Id.*, PageID 499).

Second, it denies that Ohio EPA "flip-flopped" on the priority ranking for Lake Erie.

While Ohio declared in the 2016 report that Western Lake Erie was "one of the highest, if

not the highest priority, for Ohio to address," U.S. EPA observes that the 2016 report also

declined to develop a TMDL. (Doc. 27, PageID 500). In that respect, both the 2016 and 2018

reports are consistent: both declared that Western Lake Erie is a high priority for state action, but

both opted to address Lake Erie with measures other than a TMDL. (*Id.*, PageID 500–01).

## 2. The Constructive Submission Doctrine

"The constructive submission doctrine rests on 33 U.S.C. § 1313(d)(2), which requires

EPA to act within thirty days of a state's TMDL submission." *Ohio Valley Envtl. Coal., Inc. v.*

*Pruitt*, 893 F.3d 225, 229 (4th Cir. 2018).

"Several circuits have concluded that a prolonged failure 'by a state to submit TMDLs

will be considered as a constructive submission, which in turn triggers EPA's nondiscretionary

duty to act." *Id.* (quoting *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 881 (9th Cir.

2002)); *see also Hayes v. Whitman*, 264 F.3d 1017, 1024 (10th Cir. 2001); *Scott v. City of*

*Hammond*, 741 F.2d 992, 997 (7th Cir. 1984).

"Courts that have endorsed this doctrine note that without it, states could refuse to

promulgate their own TMDLs and therefore easily frustrate 'an important aspect of the federal

scheme of water pollution control.'" *Ohio Valley*, *supra*, 893 F.3d at 229–30 (quoting *Scott*,

*supra*, 741 F.2d at 997). "Given that Congress conferred substantial regulatory powers on EPA, these courts think it 'unlikely' that Congress 'failed so conspicuously to provide EPA with the authority needed to achieve the statutory goals.'" *Id.* at 230 (quoting *Scott*, *supra*, 741 F.2d at 997).

In this case, U.S. EPA urges me to reject this uniform body of case law and find that the constructive submission doctrine is "inconsistent with the Clean Water Act." (Doc. 18–1, PageID 151). The agency maintains that the CWA is "silen[t] regarding a duty to act in the absence of a state submission of a TMDL[.]" (*Id.*, PageID 152). Because the CWA assigns U.S. EPA a nondiscretionary duty to create a TMDL only when it disapproves a state-submitted TMDL, U.S. EPA argues that the statute "preclude[s] the possibility of any implied duty to act in the face of state inaction regarding the submission of a TMDL." (*Id.*, PageID 154).

I do not find the agency's arguments persuasive.

First, despite the lack of an express basis in the CWA, the constructive submission doctrine has a practical basis rooted in the statute's directive that states submit TMDLs for U.S. EPA's review. After all, "[a] state may . . . theoretically act in such a way that it conveys to the EPA the messages that it has affirmatively determined not to submit TMDLs for its impaired waterbodies." *Hayes*, *supra*, 241 F.3d at 1023. That sort of conduct, federal courts have properly recognized, can amount to "a 'submission (a 'constructive submission') of no TMDLs," which, in turn, triggers U.S. EPA's duty to approve or disapprove this "constructive submission." *Id.*

Second, it bears emphasizing, as the Seventh Circuit did in *Scott*, *supra*, 741 F.2d at 998, that failing to recognize the constructive-submission doctrine would open a hole in the federal mandate that states timely develop TMDLs. As the court in *Scott* explained, federal courts:

> cannot allow the states' refusal to act to defeat the intent of Congress that
> TMDL's be established promptly—in accordance with the timetable provided in

the statute. In addition, to construe the relevant statute [any other way] would apparently render it wholly ineffective. There is, of course, a strong presumption against such a construction.

*Scott*, *supra*, 741 F.2d at 998.

Most simply put, "a state has a duty to produce a TMDL for each impaired body of water; if it does not, EPA has a duty to act; if EPA refuses to act, a court must faithfully enforce the CWA to compel EPA to act." *Ohio Valley Envtl. Coal., Inc. v. Pruitt*, 2017 WL 1712527, *4 (S.D. W. Va. 2017). It is by means of the constructive submission doctrine that a court can compel U.S. EPA to act when a state has repudiated its obligation to develop a TMDL for an impaired waterbody. I will therefore apply the doctrine here, just as I did in *ELPC II*, *supra*.

### 3. Analysis

U.S. EPA's arguments against the plaintiffs' constructive submission claim depend in large measure on my finding in *ELPC II* that the constructive submission claim in that case was implausible. But because the plaintiffs have alleged that circumstances have sufficiently changed from the time of Ohio's initial designation of Lake Erie as impaired to Ohio EPA's submission of its 2018 Integrated Report, I now conclude that plaintiffs' current claims are plausible and may go forward.

Most significantly, since the original designation, in May, 2018, of Lake Erie as impaired, Ohio EPA assigned Lake Erie only a low priority for TMDL development. That assignment came but a few weeks after Ohio declared, in its amended 2016 Integrated Report, that Lake Erie was "one of the highest" priorities for the State's remediation efforts.

Critically, a state's priority ranking drives the state's schedule for developing TMDLs for submission to U.S. EPA. *See* 33 U.S.C. § 1313(d)(1)(C) ("Each state shall establish for the waters identified [as impaired] . . . *and in accordance with the priority ranking*, the total

maximum daily load") (emphasis supplied). With Ohio EPA's assignment of the low priority ranking, Ohio has effectively stopped "the hands on the TMDL clock" *vis-à-vis* Lake Erie. *ELPC II*, *supra*, 349 F. Supp. 3d at 715.

Furthermore, while "[c]ourts . . . have declined to find a 'constructive submission' of no TMDLs where a state (1) has produced at least some TMDLs *and* (2) has a credible plan in place to produce others," *Ohio Valley*, *supra*, 893 F.3d at 230 (emphasis in original), Ohio's 2018 Integrated Report establishes that Ohio EPA has neither a plan in place nor a plan to create a plan for producing a TMDL for Western Lake Erie.

Thus the 2018 report contains no timetable for Ohio to develop a TMDL for Lake Erie. Indeed, Ohio did not even commit to developing a TMDL if the alternative measures it is currently pursuing fail to remediate the Lake. Instead, Ohio EPA acknowledged only that "if there is no progress then a TMDL *may* ultimately be required[.]" (Doc. 18–4, PageID 195) (emphasis supplied).

Moreover, despite the 2018 Integrated Report's heavy emphasis on measures other than a TMDL, that document does not explain how those measures can be expected to remediate Lake Erie. Indeed, plaintiffs have alleged that Ohio's years-long effort to have its farmers and proliferating factory-farming operations undertake changes voluntarily to reduce phosphorous runoff is failing. (Doc. 32, PageID 559).

Also significant to ELPC's claim is Ohio's failure to take advantage of the "Category 5-alt" designation tool that U.S. EPA recently created.

While I recognize that this designation is an organizational tool, and not something with which a state must legally comply, the designation, on its face, seems particularly appropriate for the situation Ohio faces with regard to Lake Erie's impairment. The 5-alt category applies to

waterbodies that are "[i]mpaired without a TMDL but assigned a low priority for TMDL development because an alternative restoration approach is being pursued." (Doc. 1, PageID 19 at ¶86).

That is precisely where Ohio finds itself with respect to Lake Erie. But Ohio EPA acknowledged that it could not use the 5-alt framework because the agency, notwithstanding the alternative measures it is pursuing (or intends to pursue) to remedy Lake Erie, "ha[s] not yet developed a formal 5-alt proposal to submit to U.S. EPA." (Doc. 18–4, PageID 199). Such a report is, of course, a necessary precondition to placing a waterbody in the 5-alt category. The State's inability to develop a credible plan involving alternative remediation mechanisms to restore Lake Erie – let alone "a credible plan . . . to produce" a TMDL for the Lake should those alternative mechanisms fall short, *Ohio Valley*, *supra*, 893 F.3d at 230 – supports the constructive submission claim.

Viewed in the light most favorable to ELPC, the complaint plausibly alleges that Ohio EPA has clearly and unambiguously refused to develop a TMDL for Western Lake Erie.

As just seen, the complaint contains several allegations that support the constructive submission claim. Ohio EPA assigned the Lake a low priority for TMDL development. It did so even though it recognized Western Lake Erie as a high priority and assigned the Western Lake Erie Assessment Units the highest priority score of any Ohio waterbody. Because that priority ranking drives the State's schedule for development of TMDLs, Ohio necessarily has no plan or timetable to develop a Western Lake Erie TMDL now or in the future.

Instead, the state agency has renewed its commitment to pursuing alternative remediation methods in lieu of the CWA-required TMDL. And even if those measures should fail (and

ELPC's papers suggest that they are already failing), Ohio EPA's own documents show, the agency has acknowledged only that it *may* need to pursue a TMDL.

Taken together, these circumstances generate a plausible inference that Ohio has submitted "no TMDL" for western Lake Erie. The hands of the TMDL clock are, according to the complaint's allegations, stuck, and likely to remain stuck for the indefinite future.

U.S. EPA's counter-arguments are unavailing.

First, the agency emphasizes that only a few weeks passed between Ohio's first designation of Lake Erie as impaired and its submission of the 2018 Integrated Report.

While that is true, there is no authority for the proposition that a constructive submission can occur only after a fixed or lengthy period of time. Rather, the passage of time functions in some cases as a proxy for a state's unexpressed, but nevertheless clear and unambiguous, decision to submit no TMDL for a given body of water. *See Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1425 (W.D. Wash. 1991) (finding a constructive submission where Alaska submitted no TMDL in ten years after first impairment designation, and state "failed to complete even the first stage of the TMDL process"), *aff'd on other grounds by Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981 (9th Cir. 1994); *Columbia Riverkeeper v. Pruitt*, 337 F. Supp. 3d 989, 998 (W.D. Wash. 2018) ("the subsequent 17-year delay is strong evidence that the states have abandoned" obligations to produce TMDLs for certain waterways).

The short passage of time here does not function as such a proxy, to be sure. It is, rather, the clarity of Ohio EPA's actions, discussed above, that now makes ELPC's claim of constructive submission plausible.

According to ELPC's well-pleaded complaint, Ohio EPA is essentially delaying, and intends to continue to delay indefinitely, a TMDL for Western Lake Erie in favor of alleged half

measures. Even more significantly, perhaps, Ohio does not have a plan to change course should those measures fail to remediate Lake Erie. And while I recognize that "[s]tates may pursue reasonable courses to reducing pollution *in addition to establishing TMDLs*," it is equally true that "nothing in the CWA provides that states may pursue these courses in place of, or as a means of indefinitely delaying, a TMDL." *Sierra Club v. McLerran*, 2015 WL 1188522, *10 (W.D. Wash. 2015) (emphasis supplied).

Second, I reject U.S. EPA's argument that applying the constructive submission doctrine to Ohio's refusal to develop a single TMDL amounts to "micromanaging" the state's ability to prioritize its TMDL programs. (Doc. 29–2, PageID 537).

On the contrary, this "state discretion argument is a red herring[.]" *Id.* at *6.

As the court in *McLerran*, *supra*, explained, "[a] constructive submission occurs only when a state has clearly and unambiguously *abandoned* its obligation to produce a TMDL or TMDLs." *Id.* at *7 (emphasis in original). By definition, then, a constructive submission finding means that a state has no intention even to create a TMDL for a given waterbody, let alone to assign that TMDL a priority ranking relative to other TMDLs. Regardless, "a state's discretion to prioritize TMDLs over other TMDLs does not remove its ultimate obligation to produce a TMDL for each water pollutant of concern in every 303(d) water segment." *Id.*

For these reasons, I find that ELPC has plausibly alleged that Ohio EPA clearly and unambiguously decided to submit no TMDL for Western Lake Erie. I therefore overrule U.S. EPA's motions to dismiss ELPC's and the Board of Commissioners' constructive submission claims.

## C. Count Two of Lucas County's Complaint

In count two of their complaint, the Lucas County Board of Commissioners "allege that the conduct of U.S. EPA in failing to disapprove Ohio's unlawful conduct is arbitrary, capricious, an abuse of discretion, and contrary to law." (Doc. 28, PageID 524).

U.S. EPA argues that this claim fails to state a claim on which relief may be granted "because the Board has failed to plead the existence of an unlawful act or omission by Ohio upon which EPA was required to act." (Doc. 30, PageID 548). The agency also contends that, even if the Board had identified such an act or omission, "the proper avenue for a legal challenge of that kind is either an APA 706(1) unreasonable delay claim or CWA section 505(a)(2) mandatory duty claim." (*Id.*, PageID 547–48).

Finally, U.S. EPA alleges that count two fails because it is "nothing more than an attempt to repackage" the claim from *ELPC II* that U.S. EPA had allegedly approved Ohio's submission of no TMDL for Lake Erie. (*Id.*, PageID 548).

In reviewing the Commissioners' complaint and the briefs re. U.S. EPA's motion to dismiss, it is unclear what unlawful act or omission – the alleged constructive submission of no TDML or the approval of the allegedly deficient priority ranking – forms the basis of the Commissioner's claim.

Based on the Commissioners' opposition brief, I would be inclined to find that the unlawful act at issue is U.S. EPA's "acquiescence in Ohio's decision not to develop and submit a TMDL for the western basin of Lake Erie" (Doc. 28, PageID 525), though such a construction would arguably make count two duplicative of count one. Moreover, the Commissioners' counsel spent a fair portion of his oral presentation discussing a challenge to U.S. EPA's

approval of the 2018 priority ranking, so it may be that the count is directed toward the approval of the allegedly unlawful priority ranking.

Because I have concluded that both of ELPC's claims are plausible, I will hold in abeyance my ruling on U.S. EPA's motion to dismiss count two of the Commissioners' complaint pending a further status/scheduling conference. At that time counsel should be prepared to discuss the proper disposition of count two of the complaint in light of my conclusions in this order.

## Conclusion

It is, therefore,

ORDERED THAT:

1.  U.S. EPA's motion to dismiss ELPC's complaint (Doc. 18) be, and the same hereby is, denied.

2.  U.S. EPA's motion to dismiss the Lucas County Board of Commissioner's complaint (Doc. 26) be, and the same hereby is, denied as to count one and held in abeyance as to count two.

3.  The clerk of court shall forthwith set this case for a further status/scheduling conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge